**STATE of Missouri, Respondent,**

v.

**Robert C. PARTRIDGE, Appellant.**

**No. ED 81281.**

Missouri Court of Appeals, Eastern District, Division Two.

Oct. 14, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 17, 2003.

Application for Transfer Denied Jan. 27, 2004.

Henry B. Robertson, St. Louis, MO, for appellant.

John M. Morris, Charnette Douglass (co-counsel), Jefferson City, MO, for respondent.

## OPINION

GLENN A. NORTON, Presiding Judge.

Robert Partridge appeals the judgment entered on his convictions for first degree assault, armed criminal action and first degree robbery. We affirm.

### I. BACKGROUND

Partridge and Earl Johnston worked at a cabinet shop. Early one morning, two police officers responded to a 911 call made by Partridge from the shop. They found Johnston conscious, but bleeding severely from his head and hands; part of his brain was exposed and some of his fingertips were missing. There were splatters of blood on Partridge's coat.

Partridge told one of the officers that he had gone to the shop to use one of their air hoses to fill a tire, and, while Johnston was preparing to fill the tire, Partridge left to get a soda. When Partridge returned, he said he found Johnston injured and tried to help stop the bleeding by wrapping a shirt around Johnston's head. Partridge also helped Johnston get to a chair. Partridge told the officer that an air hose must have caused Johnston's injuries. The officer examined the air hoses and noticed that none were out of place. He continued to investigate and found a bloody tire iron in the back of Partridge's pick-up truck. When he asked Partridge to explain the tire iron, Partridge replied, "that's blood on there man. Hey that ain't mine." Partridge was arrested and read his *Miranda* rights. Johnston testified at trial that the last thing he remembers before being attacked was Partridge walking around with a tire iron. Approximate-

ly $600 to $700 was missing from Johnston's wallet; Partridge could not explain how an extra $92 appeared in his wallet at the police station.

The jury found Partridge guilty of first degree assault, armed criminal action and first degree robbery. Partridge appeals.

## II. DISCUSSION

### A. Expert Qualification

At trial, the officer testified about the blood that was found at the crime scene. He testified that blood splatter is produced by force of impact and that it "flows outward and away from the impact area." The State argued that the splattered blood on Partridge's coat only could have been caused if Partridge struck Johnston from behind with the tire iron. When Partridge was helping Johnston, he could have gotten large spots of blood on him, but the fine speckles of blood had to come from when Partridge hit Johnston. While most of Johnston's blood would have gone forward, a small amount would have splattered back toward Partridge.

■ In his first point on appeal, Partridge claims that the officer was not qualified as an expert on blood splatter. Whether a witness is qualified as an expert is a matter resting primarily in the sound discretion of the trial court. *State v. Futo*, 932 S.W.2d 808, 820 (Mo.App. E.D.1996). We will reverse only when the ruling of the trial court is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997). An expert is qualified if he has knowledge from education or experience that will aid the trier of fact. *Futo*, 932 S.W.2d at 820. The extent of an expert's experience or training in a particular field goes to the weight, not the admissibility, of the testimony. *State v. Sed-*

*dens*, 878 S.W.2d 89, 92 (Mo.App. E.D. 1994). Testimony should be allowed if the expert witness possesses "some qualification." *Krame v. Waller*, 849 S.W.2d 236, 240 (Mo.App. E.D.1993).

The officer testified that he had 685 hours of police training, some of which involved the study of blood splatter. Thus, he possessed some qualification to testify about blood splatter. The amount of his education in the particular field of blood splatter went to the weight of his testimony, not to its admissibility.

The trial court did not abuse its discretion in finding that the officer was qualified to testify as an expert witness on blood splatter.

Point I is denied.

### B. Custodial Interrogation

■ In his second point on appeal, Partridge argues that the trial court erred in refusing to suppress his statement to the officer concerning the tire iron because the statements were made during a custodial interrogation without the benefit of *Miranda* warnings. Partridge claims that a reasonable person in his situation would not have felt free to leave when the officer asked him "Do you want to explain this?" and therefore he was in custody.

■ Without *Miranda* warnings, any statements made by a suspect in custody, in response to police questioning, are not admissible. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Courts examine the amount of restraint during the interrogation in light of whether a reasonable person in the suspect's position would have understood that he was in custody. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000). Custody is determined by examining the totality of the circumstances in light of the suspect's freedom to leave the scene and the pur-

pose, place and length of an interrogation. *Id.* (citing *U.S. v. Griffin*, 922 F.2d 1343 (8th Cir.1990)). Those factors are not, however, conclusive. Courts also consider the following additional factors, which if answered affirmatively, tend to show that the person was not in custody:

(1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) Whether the suspect possessed unrestrained freedom of movement during questioning;

(3) Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;

*Werner*, 9 S.W.3d at 595. If any of the next factors are answered affirmatively, it tends to show that the person was in custody:

(4) Whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) Whether the atmosphere was police dominated;

(6) Whether the suspect was placed under arrest at the termination of questioning.

*Id.* A finding of custody does not require all the foregoing factors to be present, and a strong showing of one may compensate for a weak showing of others. *Id.* at 596. Whether a suspect is in custody is a mixed question of law and fact that we review independently. *Id.* at 595.

Here, during the officer's investigation and questioning, Partridge was not told that he was free to leave, that the questioning was voluntary, or that he was not under arrest. But he was allowed to walk around freely while answering the officer's questions; his movement was not restrained in any way. Moreover, he initiated contact with the police by calling 911 to seek help for Johnston. When someone calls the police, that person should expect some sort of inquiry when the police arrive. Partridge stayed at the shop until the police arrived and then explained to them what he believed happened. Although he was arrested at the end of the questioning, there is no indication in the record that any "strong arm tactics or deceptive stratagems" were used against Partridge, nor is there any indication that the atmosphere was "police dominated." *Id.*

In light of the totality of the circumstances, Partridge was not in custody while being questioned at the shop. The trial court did not err in refusing to suppress the statements he made during questioning.

Point II is denied.

## C. Closing Argument

■ Finally, Partridge contends the trial court erred in overruling his objection to the State's mischaracterization of the evidence in closing argument. Johnston's billfold contained $40, but he testified that it should have contained between $600 and $700. At the police department, Partridge had $182 in his wallet. To explain where the rest of Johnston's money went and why Partridge did not have it, the State argued in closing that Partridge gave the missing money to someone named Lester:

STATE: If you listen to that [911] tape, you hear [Partridge] yell a name, Lester—

DEFENDANT: Objection, Your Honor, that's a total misstatement.

THE COURT: The jury may listen to the tape.

The State then went on to argue that Partridge must have given the money to Lester.

 Trial courts have wide discretion in controlling the scope of closing argument. *State v. Barton*, 936 S.W.2d 781, 783 (Mo. banc 1996). A prosecutor may argue any inference from the evidence that he or she believes in good faith is justified. *State v. Delaney*, 973 S.W.2d 152, 156 (Mo.App. W.D.1998). The 911 tape was played for the jury and received in evidence. During deliberations, the jury requested the tape. Parts of Partridge's conversation on that tape are identifiable and some are not. But one reasonable inference that could be drawn from the sounds on the tape is that Partridge is saying someone's name. The jury was able to determine for themselves if Partridge said the name "Lester." The prosecutor's suggestion that Partridge gave the missing money to Lester, made during closing argument, is not considered evidence. *See State v. McRoberts*, 837 S.W.2d 15, 23 (Mo.App. E.D.1992).

The trial court did not abuse its discretion in overruling Partridge's objection.

Point III is denied.

## III. CONCLUSION

The judgment is affirmed.

KATHIANNE KNAUP CRANE, J. and MARY K. HOFF, J. concurring.